Kinkead, J.
The three above named eases were argued and submitted together on demurrers to the petitions.
The plaintiff, the Cincinnati, Georgetown & Porstmouth Railroad Company, claiming to be an interurban railroad company, seeks to enjoin the.state tax commission from certifying to the Auditor of State that it is a “railroad company” and should pay 4 per cent., on its gross earnings, and from taking any action or making report to the Auditor of State whereby it will be charged and required to pay a tax in excess of 1.2 per cent., which is chargeable as against interurban roads.
. The state tax commission holds plaintiff to be a “railroad company,” and not “interurban road,” because its charter shows it to have been- incorporated as a railroad company.
The matter is submitted upon demurrer to the petition, which alleges that plaintiff was incorporated October 27, 1880, under the railroad laws of Ohio, for the purpose of constructing a railroad under the laws of Ohio from Cincinnati to Portmouth, and for the purpose of purchasing the property formerly owned by the Cincinnati & Portmouth Railroad Company.
.Plaintiff operated its railroad from 1880 until some time in 1902, as a narrow gauge railroad, using steam as a motive power and running from its station at Carrel street and the corner of Railroad street, eastern Cincinnati, to Georgetown, forty-two miles distant.
In 1902 it changed its gaug'e to the standard gauge, and at the same time acting under the authority of an act of the General Assembly, passed May 21, 1894 (91 Ohio Laws, 397), Section 3310-1, Revised Statutes (General Code, Section 8758), further changed its motive power from steam to electricity. At that time it constructed a large power house at Highland Parle, and installed therein the proper machinery to generate electricity to furnish power with which to operate, and also two sub-stations, one in Hamilton county and one in Brown count/, for the-purpose of enabling it to properly distribote the electricity for service in operating its cars. In addition to the power houses, substations and appurtenances, it erected the necessary poles, lines, and placed the necessary wires throughout the entire length of *619 its road for the purpose of conducting and distributing the electricity, and also erected a trolley line with proper supports therefor, so that electric cars could be used with trolley poles thereon connecting with the trolley wires, and the electricity conducted to the motors of said cars for the propulsion thereof.
It is further alleged that it has since extended its lines to different points named in the petition, among which is from Coney Island junction to Coney Island in Hamilton county, a pleasure resort on the Ohio .river; that the contract with the city of Cincinnati required it to use electricity as a motive power after its construction; that it entered into a traffic arrangement with the Cincinnati Traction Company and the Cincinnati Street Railway Company, whereby its passenger cars passed on to the tracks of the Cincinnati Traction Company, into and through the streets of the city of Cincinnati, into the interurban station; that in 1902 it ceased running trains, consisting of baggage and mailcars and coaches drawn by steam locomotives, and has since operated single electric cars with electric motors attached to the trucks thereof.
In substance, all its cars are run and operated precisely as interurban cars; it operates mail and express cars precisely of the same pattern as the passenger cars. It operates an electric freight locomotive having electric motors attached to trucks, and the greater part of its freight business is thus conducted. But it has, and uses to some extent, a steam locomotive for drawing heavy freight trains, but it claims that the use of steam power for said purpose is incidental, and is made necessary by certain grades on its line, and constitutes a very small portion of its branch lines.
The question presented by the demurrer to the petition in each case is whether the plaintiff shall be classed, for purposes of taxation, under the excise tax law, as a “railroad company,” or as an “ interurban railroad company. ’ ’ The tax upon the gross receipts of a railroad company is'4 per cent., while that upon interurban railroads is 1 1-10 per cent.
The plaintiff company contends that it is to be regarded as an interurban railroad, while the tax commission has held that it is to be considered as a railroad company, and taxed as such. Its *620 decision is based upon the theory that it was chartered as a railroad company.
There is no doubt.that interurban railroads are recognized as a distinct and separate class of railroads, as distinguished from what has always been known and recognized by law as ‘ ‘ commercial” or “steam railroads.” The distinction between the two classes of railroads has been based, not only because of the primary difference in the motive power used in the propulsion of their cars, but as well in the method or manner in which their business is carried on. “Commercial” or “steam railroads” as a class have, from- an early period, been recognized as. a distinct class, the business of such roads having been carried on in a manner peculiar to this class of road?, and which has been conducted in a materially different way from that in which the business of the interurban railroad business has been carried on.
Interurban railroads, as a class, are doubtless the result or outgrowth of the development of street railways and the application of electricity as a motive power. (Elliott Railroads, Section 1096bb; Montgomery Amusement Co. v. Montgomery Traction Co., 139 Fed., 350.)
Following on the heels of the urban street railways, whose cars were propelled by electricity, came the extension of this peculiar class of railways, accompanied by their method of operative power and their mode and character, beyond the limits of municipalities and into interurban territory. They were called interurban, because at first they were local roads between cities. The mode of operation and the character of this business was much like that of street railways. In the beginning they operated exclusively in territory distinctively local, and confined their business to the limitations in passenger traffic between cities or municipalities of limited area and distance. In their inception their traffic was of a wholly different nature and character than that of steam railroads. • At first they were designed to cover territory not reached by the commercial or steam railroads, although in some instances for short distance they may have covered the same territory'as did the steam railroads.. But their traffic even in such cases was distinctively interurban and local in character. Then and since their traffic is designed to accom *621 modate rural territory in the same manner in which street railways serve the people of cities, the people in which localities not being able to use the steam railways in the same way. Their tariff or passenger charges were much less than that of áteam roads because the cost of operation was less.
In the early period of the history of interurban roads their method of .obtaining their franchises and of securing their rights-of-way was entirely unlike that of the commercial roads. At first they possessed no power of eminent domain, but by analogy to that of street railways they secured their rights-of-way in interurban territory over highways by consent of abutting property owners and by permission of the county commissioners in the counties through which their lines were constructed.
As they developed and grew in importance the necessity of obtaining their own private rights-of-way was' recognized. This right was given them for the first time in this state by legislative enactment passed May 17, 1894. (91 O. L., 285.)
This act authorized companies which were incorporated undei Section 3236, Revised Statutes, to construct, maintain and operate electric street railroads using other than animal power for the transportation of passengers, packages, express matter, U. S. mail, baggage and freight upon the highways in the State outside of municipalities, or upon private rights-of-way.
In pursuance of this purpose, municipal councils were also authorized to grant permission to interurban roads to make use of the tracks of a street railway within the limits of cities by agreement. And if the street railway companies within the municipality and the interurban railroads could not agree, the latter were authorized to condemn the right to make use of the tracks of such existing street railway companies (91 O. L., 253, Sec. .1). These grants were limited to a term of twenty years.
This discloses a clear purpose to recognize interurban railroads as a distinct class, wholly different from street railways, and unlike steam or commercial railroads.
Interurban railroads have been defined as those connecting distant communities, which are laid mainly on the highways, and as much as lie within each of these communities as are built upon its streets and operated so as to promote local convenience and *622 make these streets more serviceable to the public. (Baldwin American Railroad Law, 9.)
In the course of the development of these roads and the growth of their business, they have become somewhat of a mixed or hybrid character. Since they have been taking advantage of the right of eminent domain conferred upon them by law, they have become much more extensive in character, and have come to carrying on their business in much the same manner as do the* commercial roads, though in a more limited character. Their lines, however, have grown in length; they now carry freight to a considerable extent, and not only run separate freight cars, but .even run trains consisting of more than one car for the purpose of transporting local freight. These electrical interurban roads, in the speed of their trains, in the distances traveled, and in their capabilities for transportation, are said to be well within the field of public utilities, hitherto occupied, by steam railroads alone. (Maliott v. Collinsville & C. R. Co., 108 Fed., 313.)
And the courts have applied to this class of roads the same rules of negligence in the conduct of their business as govern the operation of steam roads. (Cincinnati & C. R. Co. v. Lehe, 68 O. S., 101.)
The similarity of the mode of conducting the business of these roads to that of steam railroads has given rise to some difficulty in applying statutory provisions to them. But with all their development, and approach in similarity to commercial steam roads, they still stand in a' distinctive class by themselves, and are recognized in law as interurban railroads.
The difficulty presented in this ease arises from the fact, as it is claimed by defendants, that the plaintiff was chartered as a steam railroad; and though it afterwards changed its mode of operation from steam propulsion, and from the method of operation of steam roads, to that pursued by distinctively interurban, it is said that it must still be classed as a “railroad- company.”
It is claimed, on the other hand, that it took advantage of the law passed May 21, 1894 (91 O. L., 397), which authorized any railroad theretofore constructed to use electricity as a motive power; that in pursuance of this law it not only electrified its road, but that it completely changed its method of operation *623 from steam to the same character as that pursued by roads originally incorporated as interurban railroads. It Is averred that plaintiff has, since such change, ceased to run trains of cars propelled by steam engine, and has since run single cars propelled by electricity, poles and wires; that any use of steam as a motive power, or any running of trains of freight cars propelled by steam engines, is only incidental to its business as a distinctively interurban road; that its charges for the carriage of passengers and freight are those imposed by interurban roads and less than those charged for similar service by steam roads, and for this reason it is to be classed for purposes of taxation under the laws of Ohio as an interurban road.
The precise question, then, is whether it shall be considered as a commercial railroad, for purposes of taxation, because it was originally chartered as a commercial road, or whether it shall be classed as .an interurban road because of the changed method of carrying on its business.
- This must be decided by recourse to the meaning and purpose of the law in question and by the powers exercised by the plaintiff, and not exclusively by its charter.
I will consider briefly the charter of the plaintiff company, -and the effect which it should have on the pending question.
It is organized for the purpose of constructing and operating a railroad under and by virtue of the laws of Ohio. • It is provided that said railroad shall be constructed from the city of Cincinnati, in the county of Hamilton, and state of Ohio, thence through the counties of Hamilton, Clermont, Brown and Adams, to Portsmouth, in Scioto county. Said corporation is organized for the purpose of purchasing the railroads, franchises and property, real and personal, owned by the Cincinnati & Portsmouth Railroad Company, and sold at judicial sale to Henry Braehmann, and for the further purpose of finishing and completing said railroad between the points and through the counties mentioned and operating the same.
It was chartered October 27th, 1880, as the petition alleges, “under the railroad laws of the state of Ohio, for the purpose of constructing and operating a railroad under and by virtue of said laws,” etc.
*624 All corporations, whether for the purpose of constructing and operating a railroad, or carrying on any other business, are organized under the general laws for the organization of corporations. It is not organized under the railroad laws as alleged, but its purpose to become a railroad company is disclosed by its charter, which states the kind of business it intends to carry on. It is entirely clear that plaintiff in its earlier history became a commercial railroad company because it exercised the powers and rights conferred by the chapter of the Revised Statutes upon “Railroad Companies.” It could not then have been considered as any other kind of a corporation, because there were no such roads in existence as 11 interurban railroads, ’ ’ as they have since become known.
I think it is entirely clear that the plaintiff became known as a “railroad company” by reason of the character of business which it at first carried on. It engaged in what was then known as railroad business, because its powers were those prescribed by statutes relating to railroads. Its charter did not authorize it to exercise the right of eminent domain, and the numerous other things which the law authorized such corporations to do. It acquired these powers by law. So its character as a railroad- company, as that term has been understood, nyust have been more distinctly established by the laws relating to railroad companies, which determined the character of business which it -carried on by its charter.
Will this not show then that a change made by the plaintiff in the method of carrying on its business, by virtue of new powers conferred by law — not upon railroad companies — but upon corporations organized under Revised Statutes, Section 3236, results in changing its character and nature as a corporation, particularly in so far as relates to the business carried on by it? It seems so.
It is my judgment that when the plaintiff elected to take advantage of the act passed May 21, 1894, by changing its motive power, equipment and method of operation to that of interurban roads, it completely changed its character as a corporation because in pursuance of the powers conferred by law upon interurban roads, it ceased to carry on the business of a commercial *625 railroad company, but on tbe other hand has carried on the business of an interurban railroad.
As man is known by his deeds, so is a corporation known by the kind of business it carries on. The only difference between plaintiff and a corporation organized since interurbans have come into existence, is perhaps the fact that the charter of interurban roads may specifically state in detail the intention to construct and operate an interurban road. But how different is it, when the Legislature authorizes a previously existing railroad company to change its character as such and become an interurban by change in equipment and method of operation.
I am of the opinion, therefore, that the exercise of the powers conferred by law upon such corporations, and their consequent method of doing business, should be the test in determining the question, rather than the charter alone.
It seems to be made by the language of the taxing act itself, that the plaintiff must be classed as an interurban railroad. Section 46 of the act of May 10, 1910, provides:
“That any * * * corporation, wherever organized or in-incorporated, * * * token engaged in the business of operating a (street, surburban or) interurban railroad, wholly or partially within the state, whether the ears- used in such business are propelled by animals, steam, cable, electricity, or other motive power, is a street, surburban or interurban railroad company.”
The test prescribed by the taxing law itself is the kind of business carried on by the corporation. And this is as it should be, because an excise tax is a tax upon the business. And the tax authorized by the law in this state is upon the business carried on.
The law provides that when a corporation engaged in the business of operating an interurban railroad, without regard to whether the ears be propelled by steam or electricity, is to be considered for purposes of taxation as an interurban railroad company.
The act prescribes that the statement of an interurban railroad shall contain the entire gross earnings, etc.; that the com *626 mission shall ascertain and determine the gross earnings of interurban railways, and report the same to the Auditor of State, and that “the Auditor of State shall charge for collection from each * * * interurban railroad company, a sum in the nature of an excise tax, for the privilege of carrying on its intrastate business, to be computed on the amount so fixed and reported to him by the commission as the gross earnings of such company on its intrastate business for tire year,” etc., * * * by taking one and two-tenths per centum of all gross earnings.
Each railroad company is required' to pay four per centum on its gross receipts.
It is apparent that the law recognized the distinction between the kinds of business, as well as the charges made respectively by “railroad companies,” and “interurban railroads,” because of the per centum charged. The tariff charges of interurban railroads are less than those of commercial railroads, and consequently the per centum of tax is less. It is alleged that the tariff charges of plaintiff are those of interurban roads.
Applying the law to the facts alleged in the petition, the judgment of the court is that the plaintiff is to be regarded within the meaning of the excise tax law, not as a commercial or steam railroad company, but as an interurban railroad company, and taxed as such.
The question has been mooted, whether the tax commission may be sued, whether, being a representative of the state, it is not exempt. But the appearance of the commission has been entered. The commission is an executive arm of the state, clothed with quasi judicial powers. I believe it has been held in other states having tax commissions, that their conclusions, at least in some matters, is final, and not subject to supervision by the courts. It has always been regarded as fundamental that parties improperly taxed may resort to the courts for relief. And there seems to be no valid reason why jurisdiction should not be exercised by a 'court of equity in restraining such a body as the state tax commission from improperly taxing corporations under the excise law.
The order of the court is that the demurrer to the petition be overruled.
*627 In the case of The Felicity & Bethel Railroad Company v. the Commission, the facts appearing in the petition are in substance the following:
The Felicity & Bethel Railroad Company was incorporated January ,18th, 1904, under the railroad laws of Ohio, for the purpose of constructing and operating a railroad from Bethel to Felicity, a distance of 8% miles. It connects with the Cincinnati, Georgetown & Portsmouth Railroad Company, which is operated with electricity. This road does not operate any freight cars, and only one passenger car, which is an electric ear with electric motors, trolley poles and a trolley wire, a controller on the front of the car to turn on and shut off the elecricity, said ear being in charge of a motorman and a conductor; that it has a pole line with electric wires suspended thereon for the distribution of the electric power; that its single passenger car is in continuous operation, running back and forth from Bethel to Felicity, stopping at all road crossings and many farm houses, and at all settlements along the line, for the purpose of taking on and discharging passengers and small express packages; that its charter does not provide or require that it should use steám as a motive power, or that it should run trains drawn by a locomotive, with coaches attached thereto, and it does not use steam but all its operation is by electricity; that it is an interurban railroad, and not a railroad, as said terms are used in the tax commission act.
The charter of this company provides that its purpose was to acquire right-of-way, build, equip, maintain and operate a railway, to transport freight, passengers, express, mail, and to do a general railroad business.
It seems clear that this road is to be considered as an interurban road, and taxed as such under the excise tax law.
The demurrer to the petition in this ease is therefore overruled.
In the third case, of the Youngstown & Ohio River Railroad Company v. the Commission, the facts are substantially as follows:
The Youngstown & Ohio River Railroad Company was chartered December 8, 1905. It provided that the kind of improve *628 ment intended to be constructed by this corporation is a railroad, using either steam or electricity as a motive power. It is averred that the city of Salem, under a law authorizing it, constructed a line of railroad between the city of Salem and a point at or near the village of "Washingtonville, in Columbiana county, Ohio, in such manner as to connect with the Niles and New Lisbon branch of the Erie Railroad, and was known as the Salem Railroad, and was constructed for the purpose of permitting the Erie Railroad and its connecting lines to compete with the Pittsburgh, Ft. AY. & C. R. R. Co. at the city of Salem, and said Salem Railroad was operated as >a steam railroad and in no other manner.
Actions were thereafter brought invalidating the law under which the road was built, and the same was sold, becoming the property of the Pittsburgh, Ft. W. & C. R. R. Co. In 190G the latter leased ¡the road to the Youngstown & Ohio River Railroad Company, which has since used the line of railroad known as the Salem Railroad as a part of the Youngstown & Ohio River Railroad Company’s line, and has equipped the same for electrical operation, and ever since the 24th day of December, 1907, has carried on the passenger traffic of said road entirely by means of its electric cars, and no other part of the operation of said line has been carried on by means of steam power, except a part of the freight traffic, some of which has been hauled by steam, and by means of electrical power; that the engines and rolling stock acquired by the lease have been used at times for hauling freight over other parts of its line between Washingtonville and the city of East Liverpool; that it has constructed power house and all electrical^ equipment necessary for the operation of an electric road.
It is averred that of the ninety-one per cent, of its gross earnings, constituting its intrastate business, less than fourteen per cent, was earned by means of the use of steam power in the operation of its road, all the remainder being earned by the use of electricity, in hauling both freight and passenger cars. That all of the passenger cars are operated as single interurban electric cars, and are interurban electric cars, and not steam railroad cars.
*629 It admits that it also to some extent uses steam locomotive for drawing its heavy freight trains, bnt alleges that the nse of steam poiver for said purpose is incidental, and is made necessary 'by certain heavy grades on its main line, and constitutes a very small part of its total operation.
It appears from the petition that this road carries on a part of its business as a commercial or steam railroad company, and a part of it as an interurban railroad company. It is distinctly averred that less than fourteen per cent, of its business is earned by the use of steam, and the remainder by the use of electricity.
My judgment is, that in the conduct of its business by the use of steam and its equipment as a railroad company, it is carrying on the business of a commercial or steam railroad company.
On the other hand, in the conduct of its business by the use of electricity and electrical equipment, it is engaging in the business of an interurban railroad.
As the tax is on the business done, there can be no objection to assessing the tax against this company in the two capacities.
This suggests the futility of regarding the charter of a corporation as the test, rather than the nature and character of business done by it. A company may be incorporated for the purpose of engaging in the business of operating an interurban railroad, but may in fact do a considerable portion of its business as a commercial steam railroad. It would be taxed as an interurban railroad, when in fact it ought to pay a part of its tax as a “railroad company.”
The judgment of the court is, that the demurrer is not well taken, so far as the petition seeks to enjoin the defendants from certifying the percentage of business done by it as an interurban railroad, for purposes of taxation as a railroad company, but is good in so far as it seeks to enjoin the commission from certifying the percentage of its business done by it as a railroad company, for purpose of taxation as such.
It is suggested that the petition be amended, by stating two causes of action, and the demurrer be resubmitted, and an order made according to the views here expressed.